# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LAURA SANDT-MIKA,       )
                                       )
                Plaintiff,      )     Case No. 07 C 2055
                                       )
        v.                   )
                                       )     Magistrate Judge Geraldine Soat Brown
SBC DISABILITY INCOME PLAN,   )
                                       )
           Defendant.     )

## MEMORANDUM OPINION AND ORDER

Plaintiff Laura Sandt-Mika ("Sandt-Mika"), a former quality control manager of Ameritech Services, Inc., brought this suit pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), against defendant AT&T Disability Income Program, f/k/a SBC Disability Income Plan (the "Plan"). Sandt-Mika claims that the Plan improperly denied her application for short-term disability benefits. Both Sandt-Mika and the Plan have moved for judgment on the administrative record. [Dkt 27, 30.] The parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Dkt 16.] For the reasons set forth below, Sandt-Mika's motion is denied and the Plan's motion is granted.

**A.      Sandt-Mika's Employment and the Plan**

Sandt-Mika was employed as a Manager-Quality/M&P/Process by Ameritech Services, Inc.

(Answer ¶ 2.) [Dkt 14.]  According to Ameritech's description, which Sandt-Mika does not dispute,

her responsibilities included:

> the identification, analysis, development, and documentation of process improvements.  Consults with line management on process management and improvement.  Identifies and makes recommendations for process improvements. . . .

(AR 85.)  Her job was classified as a "sedentary" position, requiring "process implementation,"

sitting, typing and talking on the telephone.  (AR 61.)  She worked Monday through Friday, 8 a.m.

to 5 p.m.  (AR 61.)[2]

As a benefit of her employment, Sandt-Mika participated in an employee welfare benefit plan

providing short-term disability benefits for up to 52 weeks.  (Plan Text, AR 11.)  Short-term

disability benefits are available to eligible  employees who are partially or totally disabled as defined

under the Plan.  (Plan Text, AR 11.)  "Partial Disability" or "Partially Disabled" is defined by the

Plan as the following:

> that because of Illness or Injury, an Employee is unable to perform all of the essential functions of his job or another available job assigned by the Participating Company, within the same full- or part-time classification for which the Employee is qualified . . . .

---

[1]The parties jointly submitted the administrative record, which is cited herein as "AR __." [Dkt 22.] It includes a copy of the text of SBC's Disability Income Plan ("Plan Text," AR 2-24) and the claim review record for Sandt-Mika's claim.  (AR 25-160.)  The Plan also submitted the Declaration of Nancy Watts, a benefits analyst for AT&T Services, Inc.("Watt's Decl."), discussing the Plan administration and attaching Plan documents. [Dkt. 29.]

[2]Sandt-Mika's employment with AT&T ended on May 20, 2006.  (Pl.'s Mem. at 4 n. 3.)

(Plan Text, AR 10.)[3] Eligible employees may receive short-term disability benefits beginning on the eighth consecutive calendar day of an absence caused by an illness or injury. (Plan Text, AR 5 (referring to Summary Plan Description, Watts Decl., Ex. 2 at DI2, DI5).) Short-term disability benefits may be withheld under the Plan if the claimant does not provide sufficient medical information about her condition. (Plan Text, AR 14.)

AT&T Inc. ("AT&T") is the Plan Administrator with discretionary authority to determine Plan eligibility and to appoint one or more Claims Administrators. (Watts Decl. ¶¶ 2, 3.) AT&T appointed Sedgwick Claims Management Services, Inc. ("Sedgwick") as a third party Claims Administrator for the Plan. (Watts Decl. ¶ 4.) As Claims Administrator, Sedgwick has authority to administer claims without prior written approval by AT&T, to determine benefits eligibility and to interpret the terms of the Plan. (Watts Decl. ¶¶ 6, 8, 9.) The Plan provides:

> [E]ach Claims Administrator and each subcommittee to whom claim determination or review authority has been delegated shall have full and exclusive authority and discretion to grant and deny claims under the Plan, including the power to interpret the Plan and determine the eligibility of any individual to participate in and receive benefits under the Plan. The decision of . . . a Claims Administrator or any subcommittee, as applicable, on any claim, in accordance with the claim procedures set forth in this Subsection 5.5, shall be final and conclusive and shall not be subject to further review.

(Plan Text, AR 21.) Sedgwick receives a flat fee for its services irrespective of its claim determinations and plays no role in funding or budgeting claims for payment. (Watts Decl. ¶¶ 8, 9.)

**B.  Sandt-Mika's Disability Claim**

On October 11, 2005, Sandt-Mika visited the office of her primary care physician, Dr.

---

[3]Under the Plan, the definition for "Total Disability" is the same as that for "Partial Disability" with regard to short term disability. (Plan Text, AR 10-11.)

Maelen Pantano, complaining that she was "very, very fatigued," under "a lot of stress" and "not able to work." (AR 142.) According to Dr. Pantano's notes, Sandt-Mika attributed the stress to concern for her daughter who had been diagnosed with a benign tumor that was thought to be cancerous. (AR 142.) Dr. Pantano examined Sandt-Mika and prepared an internal medicine progress note in which she wrote under "Assessment and Plan":

> The patient has an acute stress reaction. She was given a note to be off work until the 31st. The patient is not able to work because of inability to sleep. I gave her a referral for behavioral health, four visits, for acute stress reaction. The patient is advised to rest and to go for counseling. I gave her Ambien for nighttime. . . . I ordered a comprehensive metabolic profile, CBC, urinalysis, and a cardiac risk profile."

(AR 143.) Dr. Pantano's progress note also reflects that Sandt-Mika had a temperature of 100.6° Fahrenheit. (AR 142.)

On the following day, October 12, 2005, Sandt-Mika initiated a claim for short-term disability benefits under the Plan by contacting Sedgwick's SBC Medical Absence and Accommodation Resource Team ("SMAART") by telephone. (AR 61.)[4] During the conversation, Sandt-Mika indicated that she was off work until October 31 due to "stress." (AR 64-65.) The SMAART representative explained SBC's disability policies and procedures, including the requirement that a claimant supply necessary medical records, and explained to Sandt-Mika that "[c]laims without medical information supporting a complete inability to perform your assigned job duties by the medical due date will be denied." (AR 61-64.)

---

[4]The stipulated administrative record includes the computer log of notes taken by the SMAART claims managers. (AR 25-65.) Sandt-Mika has not objected to those notes and they will be considered as business records under Fed. R. Evid. 803(6).

## C.    SMAART's Review of Sandt-Mika's Claim

By letter dated October 12, 2005, SMAART notified Sandt-Mika that a claim had been initiated and a "determination [wa]s pending receipt of medical substantiation from [her] treatment provider." (AR 156.) SMAART further explained that "[t]o qualify for benefit payments under the SBC disability plans, your medical condition should involve a sickness or injury, supported by medical documentation that prevents you from performing the duties of your job with or without reasonable accommodations." (AR 156.) The letter stated that Sandt-Mika or her medical provider must submit all relevant medical records by October 27, 2005, and "[i]f the medical documentation received from your treatment provider does not contain information that establishes that your condition prevents you from performing the duties of your job with or without reasonable accommodations, your claim will not qualify for benefit payments under the SBC disability plans." (AR 156.)

Over the next several days, SMAART contacted Dr. Pantano by telephone and by fax, seeking information about Sandt-Mika's condition. (AR 57-60, 116.) On October 26, 2005, Dr. Pantano responded by faxing to SMAART the medical progress note she prepared from Sandt-Mika's initial visit on October 11, 2005. (AR 139-46.)[5] Although Dr. Pantano's progress note states that the doctor ordered a "comprehensive metabolic profile, CBC, urinalysis, and a cardiac risk profile" for Sandt-Mika and there is an October 17, 2005 notation in SMAART's system indicating an October 19, 2005 appointment for blood work (AR 58-59), the information Dr. Pantano sent on October 26, 2005 did not include any laboratory results. (AR 139-46.)

_____

[5]In addition to the October 11, 2005 progress note, Dr. Pantano faxed to SMAART Sandt-Mika's signed authorization for release of protected health information (AR 144.)

A SMAART case manager reviewed Dr. Pantano's October 11, 2005 progress note, and entered the following notation on SMAART's system: "[I]t is unclear if very very fatigued is self reported or fatigued. Her pe [physical exam] is normal except does have slight fever. No notes from therapist recd." (AR 56.) The SMAART case manager also noted several questions to consider, including: "What are objective observables to substantiate severity and [employee] inability to work sedentary job duties?" (AR 56.)

The claim was then referred to a SMAART physician advisor, Dr. Elizabeth Henderson, a board certified psychiatrist. (AR 53-56.) According to the notes in the SMAART system, in response to a request for objective data regarding Sandt-Mika's behavior and mental status, Dr. Pantano stated on October 28, 2005 that "she did not have the correct release of information to reveal that 'type' of information," and refused to give any further detail, stating only that she had referred Sandt-Mika to a psychiatrist and extended her return to work date to November 1, 2005. (AR 53.)

Dr. Henderson concluded that the "[a]vailable information suggests fatigue and some type of medical process involving fever, but there are no objective findings to support depression or impaired psychiatric functioning." (AR 53.) Dr. Henderson concluded that the "[a]vailable information [did] not support impairment" of Sandt-Mika's ability to perform repetitive work activities or her ability to comprehend and follow instructions. (AR 53-54.) In response to the question about the objective observables that substantiate severity and an inability to work, Dr. Henderson stated that the "[a]vailable information does not contain descriptions of her mental status or behavior." (AR 54.)

**D.     SMAART's Initial Denial of Claim**

As of November 2, 2005, Dr. Pantano's October 11, 2005 progress note was the only medical documentation Sandt-Mika had submitted to support her claim for disability.  After receiving Dr. Henderson's review, SMAART denied Sandt-Mika's claim.  (AR 51.)  SMAART contacted Sandt-Mika on November 2 to notify her of that decision and advise her that SMAART would re-evaluate the claim if she submitted additional medical information, or she could appeal the denial.[6]  (AR 50-51.)

On November 4, 2005, Dr. Pantano's office contacted SMAART, requesting the rationale for its denial of Sandt-Mika's claim for disability.  (AR 49.)  SMAART's claim manager explained that Sandt-Mika lacked objective medical information to support a condition so severe as to prevent her from performing her job duties, but agreed to fax to Dr. Pantano a Mental Health Treatment Provider Statement ("MHTPS") for her to complete to substantiate Sandt-Mika's disability.  (AR 49, 125-27.)  SMAART decided to withhold its claim denial letter pending receipt and review of Dr. Pantano's completed MHTPS.  (AR 49.)

**E.     Sandt-Mika's Supplemental Medical Information From Dr. Pantano**

On November 7, 2005, Dr. Pantano faxed to SMAART the completed one-page MHTPS form.  (AR 119-20.)  Dr. Pantano stated that she had evaluated Sandt-Mika on October 11, October

---

[6]The Administrative Record contains a Disability Benefit Denial Notice, dated November 2, 2005, directed to the attention of Melinda S. Campbell, Sandt-Mika's supervisor.  (AR 51, 128-29.)  The form notice describes Sandt-Mika's claim for disability benefits and reflects SMAART's decision to deny benefits because "[m]edical information submitted was not sufficient to support the claim for disability benefits based on the provisions of the Plan." (AR 128.)  It is unclear whether that notice was also sent to Sandt-Mika.

28 and November 3, 2005. (AR 120.) In response to the question asking what in Sandt-Mika's clinical picture makes it unlikely for her to be able to continue working, Dr. Pantano wrote: "Acute stress reaction preventing sleep[;] patient requires evaluation by psychiatry[;] sleep loss prevents her from safe driving and caring for self and family." (AR 120.) Regarding what job required activities Sandt-Mika was unable to do, Dr. Pantano wrote, "Concentrate or drive due to Rx's and loss of sleep." (AR 120.) The only medication listed was Ambien. (AR 120.) As to estimated return of work date, Dr. Pantano wrote, "Per advice of psychiatrist." (AR 120.) The form asks, "Is the employee's current cognitive functioning impaired? If yes please give examples." Dr. Pantano left that space blank. (AR 120.)

Dr. Pantano also circled the selections that best described Sandt-Mika's current mental status under various categories, as follows: appearance: well groomed; motor activity: normal; affect: both sad and appropriate; mood: depressed; speech: pressured and soft; thought process: circumstantial; judgment: intact; orientation: fully oriented; delusions: none; hallucinations: none; at risk behavior: no. (AR 120.)

Particularly relevant to Sandt-Mika's current argument is the fact that the MHTPS form includes spaces for the treating physician to provide information according to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM"). Dr. Pantano did not complete any blanks for that information (under Axes I-V). (AR 120.) Rather, Dr. Pantano diagnosed Sandt-Mika with "acute stress reaction," "sleep disturbance" and "malaise and fatigue," and noted diagnoses numbers that (according to Sandt-Mika) are based on a code by which various diseases are classified by the Internal Statistical Classification of Diseases and Related Health Problems ("ICD"). (AR 120; Pl.'s Mem. at 3 n. 2).

SMAART reviewed Dr. Pantano's completed MHTPS form, and concluded that even with the supplemental documentation, the medical records did not "contain observable info[rmation] to establish [the] severity" of Sandt-Mika's condition. (AR 48.) The SMAART case manager was to proceed with completing the benefits denial letter. (AR 48.) On November 10, 2005, however, Sandt-Mika contacted SMAART to explain that she had an appointment with a specialist and would be sending additional medical information following that visit. (AR 47.) SMAART once again placed its denial letter on hold pending review of the additional medical information. (AR 47.)

## F.     Medical Records from Psychiatrist

On November 11, 2005, Sandt-Mika saw Dr. Fe Velasco, a psychiatrist, and on November 14, Dr. Velasco submitted to SMAART a single page of handwritten notes from her session with Sandt-Mika. (AR 114-15.) While somewhat difficult to read, Dr. Velasco's notes included the following comments: Sandt-Mika "states [she] had switched to a new position. Personality clash with supervisor. . . . Worries about sick child who suffers from benign tumor." (AR 115.) The notes also listed the following: "low energy . . . weight loss, anemia, crying spells, feeling hopeless, helpless, difficulty concentrating, low self-esteem," and stated that Sandt-Mika was prescribed Ambien by her primary care physician. (AR 115.) Dr. Velasco diagnosed Sandt-Mika with "major depressive disorder, single episode," and prescribed individual therapy and Lexapro.[7] (AR 115.)

---

[7]According to Sandt-Mika, Lexapro is an antidepressant. (Pl.'s Mem. at 7.)

### G. SMAART's Denial of the Claim

After receiving Dr. Velasco's notes, SMAART concluded that Sandt-Mika did not qualify for short term disability benefits under the Plan.  (AR 43, 109-10.)  SMAART sent Sandt-Mika a letter dated November 18, 2005, explaining that SMAART's determination to deny benefits was based on:

> a review of medical documentation provided by M. Pantano, MD on October 24, 2005.  Dr. Pantano documented on October 11, 2005 that you were very tired and complained of headaches and stress.  He further documented on October 19, 2005 that blood work was performed.  On October 24, 2005, it is documented that you reported the same symptoms and discussed family stress.  Your records were reviewed by the SMAART Physician Advisor on October 30, 2005 and found lacking clinical indicators to support a totally disabling condition.  An attempt was made by the Physician Advisor to obtain additional medical information from Dr. Pantano on October 30, 3005.  Dr. Pantano advised during that conversation that you had been referred to a psychiatrist.  Additional information was received on November 7, 2005 from Dr. Pantano and Dr. F. Velasco on November 14, 2005, but was not sufficient to overturn the denial determination.  Clinical information does not document a severity of your condition(s) that supports your inability to perform your occupation as a Manager-Quality from October 19, 2005 through your return to work.

(AR 109-10.)  The letter advised Sandt-Mika of her right to appeal the determination, enclosed a copy of the appeal procedure and appeal form, and explained that she could submit additional information in support of her appeal.  (AR 110.)

### H. Sandt-Mika's Submission of Additional Documentation from Dr. Velasco

On November 21, 2005, Sandt-Mika contacted SMAART to request that SMAART send Dr. Velasco an MHTPS form to complete.  (AR 41-42.)  On November 29, 2005, Dr. Velasco faxed the completed MHTPS form to SMAART.  (AR 106-08.)  Dr. Velasco's comments were based solely on Sandt-Mika's November 11, 2005 appointment.  (AR 108.)  In response to the question regarding

Sandt-Mika's "current signs of illness/complaints/precipitating event," Dr. Velasco wrote, "[P]ossible termination/laid off from job. For the past 5 months had sleeping & eating difficulties with weight loss, low energy, difficulty concentrating, anhedonia, crying spells, feelings of hopelessness, helplessness & feeling depressed." (AR 108.) Dr. Velasco indicated that Sandt-Mika had a sad, flat affect and a depressed mood, but that she was well groomed, her speech was normal, her thought process intact, and she was fully oriented. (AR 108.) In response to the question whether Sandt-Mika's current cognitive functioning was impaired, Dr. Velasco responded, "[Y]es patient is forgetful and has difficulty concentrating." (AR 108.) In response to the question asking what in Sandt-Mika's clinical picture makes it unlikely for her to be able to continue working, Dr. Velasco wrote, "patient is depressed with difficulty concentrating, forgetful, has low energy with difficulties sleeping and eating." (AR 108.) In response to the question of what job required activities Sandt-Mika was unable to do, Dr. Velasco left the space blank. (AR 108.) Dr. Velasco listed Lexapro as Sandt-Mika's current medication. (AR 108.)

Central to Sandt-Mika's current argument is the fact that, unlike Dr. Pantano, Dr. Velasco completed the five levels (Axes) under the DSM-IV classifications of psychiatric diagnoses. (AR 108.) Although the administrative record does not include a description of the DSM-IV classifications, Sandt-Mika's counsel attached as an exhibit to her Memorandum portions of a document entitled "Diagnostic Criteria from DSM-IV-TR," published by the American Psychiatric Association. (Pl.'s Mem. at 6; *id.* Ex. 2 ("Diagnostic Criteria Reference").) That document describes Axis I as "Clinical Disorders," Axis II as "Personality Disorders," Axis III as "General Medical Conditions," Axis IV as "Psychosocial and Environmental Problems," and Axis V as "Global Assessment of Functioning." (*Id.* Ex. 2 at 39-47.)

On the MHTPS form (AR 108), Dr. Velasco wrote, under Axis I, "296.2x," which the Diagnostic Criteria Reference guide codifies as "Major Depressive Disorder, Single Episode." (Pl.'s Mem. Ex. 2 at 24.) Under Axis II, Dr. Velasco wrote "None." (AR 108.) Under Axis III, Dr. Velasco wrote "Physically healthy." (AR 108.) Under Axis IV, Dr. Velasco wrote "Sick child, possible lay off from job." (AR 108.) Finally, under Axis V, Dr. Velasco ascribed a Global Assessment of Functioning [GAF] rating of "50" (AR 108), which is defined in the Diagnostic Criteria Reference guide as: "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting)" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." (Pl.'s Mem. Ex. 2 at 44-45.)

SMAART received and considered the MHTPS form from Dr. Velasco and concluded that the additional documentation did not support reversing the denial of benefits for the period from October 19 (the eighth day of Sandt-Mika's absence from work) through November 29. (AR 38-40.) SMAART advised Sandt-Mika by telephone and by letter that the information received from Dr. Velasco on November 30 did not alter the previous denial decision, and that Sandt-Mika must submit a written appeal in order to have the SMAART Quality Review Unit consider her claim and any additional information. (AR 38-40, 102.) SMAART again provided Sandt-Mika with a copy of the appeal procedures and appeal form. (AR 99-105.)


I.      **Sandt-Mika's Appeal of Denial**

On January 12, 2006, Sandt-Mika submitted to SMAART her written appeal of its denial decision. (AR 95-97.) In her appeal letter, Sandt-Mika stated that she was "unable to perform [her] duties at SBC for the reason that [she was] suffering from severe depression which was caused,

mostly, by a hostile work environment." (AR 96.) She further explained that she was under the care of Dr. Velasco, who had prescribed anti-depressant medication, was undergoing counseling by a licensed therapist, and also been prescribed sleeping medication (Ambien) by her primary care physician. (AR 96.) She stated, "Both these medications impair my ability to drive an automobile and I have experienced side affects [sic] which include forgetfulness, headaches and nausea. This further supports reasons why I am unable to perform my duties at SBC." (AR 96.) Sandt-Mika did not submit any medical documentation with her letter of appeal. (AR 95-97.) Sandt-Mika argued that Dr. Velasco's submission of information on November 29 was not given "full consideration." (AR 96.)

SMAART responded by letter dated January 25, 2006, acknowledging receipt of Sandt-Mika's appeal and advising that she should submit medical records, including chart notes, diagnostic tests, and hospital summaries relevant to the absence. (AR 93.)

A SMAART appeals specialist reviewed the medical information submitted by Sandt-Mika and contacted Sandt-Mika to discuss the appeal process. (AR 33-36.) Sandt-Mika advised the appeals specialist that she had additional information to submit for consideration. (AR 33.) He directed her to submit the information by February 7, 2006, and telephoned Sandt-Mika on February 2 to remind her of the deadline. (AR 33.) Sandt-Mika explained that she had an office visit with her doctor on February 3, and would be providing additional medical information after that appointment. (AR 33.) When SMAART did not receive any medical information by February 7, the appeals specialist told Sandt-Mika that she had until February 9 to provide the additional information or to request an extension. (AR 32-33.)

On February 8, 2006, Sandt-Mika submitted to SMAART a brief letter from Anne

13

Wleklinski, L.P.C., stating only that she had seen Sandt-Mika on February 6 and that Sandt-Mika "continues to work in therapy on grief/loss issues, as well as anxiety due to job related stress." (AR 86-87.) Sandt-Mika also submitted an additional half-page of handwritten notes from Dr. Velasco from two office visits on December 2, 2005 and February 3, 2006. (AR 86-89.) The December 2, 2005 entry describes Sandt-Mika's status at work and claim for disability, the condition of her daughter, and contains Dr. Velasco's plan, specifically, individual therapy, Lexapro and a follow-up visit in two months. (AR 89.) The February 3 entry is even more brief, stating that Sandt-Mika fears she will be laid off from work, and containing Dr. Velasco's plan for individual therapy, Lexapro and a follow-up visit in three months. (AR 89.) Sandt-Mika did not request a further extension of time and did not submit any additional medical documentation. (AR 32.)

**J.      Independent Physician Advisor Review**

On February 10, 2006, SMAART forwarded Sandt-Mika's appeal file to Insurance Appeals, LTD., an independent review organization. (AR 32, 77.) Dr. Robert Slack, a psychiatrist, was the independent physician advisor who reviewed the information Sandt-Mika and her providers had submitted to SMAART. (AR 31, 80.) In his written assessment dated February 17, 2006, Dr. Slack summarized and analyzed the medical documentation submitted in support of Sandt-Mika's claim. Dr. Slack concluded that Dr. Pantano's November 11, 2005 MHTPS form diagnosing Sandt-Mika with "actute stress disorder" lacked any psychiatric or mental status evaluation, and that "the information historically necessary for this diagnosis according to DSM IV standards is absent from the record." (AR 78.) Dr. Slack observed that Dr. Velasco's notes reflect that Sandt-Mika was "concerned about her job due to having been moved to a new position, experiencing significant

conflict with the new supervisor, and being fearful that she would be fired." (AR 78.) Dr. Slack noted that Dr. Velasco evaluated Sandt-Mika's mental status as "completely normal with the exception of some sadness and anxiety." (AR 78.) He finally observed that while Dr. Velasco diagnosed Sandt-Mika with major depression, "the information necessary for this diagnosis was absent from the record." (AR 78.)[8] Finally, Dr. Slack noted that Sandt-Mika conceded in her written appeal that her "psychiatric symptomatology was a direct result of what she perceived as a hostile work environment." (AR 78.)

Based on his review of the file, Dr. Slack concluded that "[t]here is no evidence in this record that Ms. Mika lost the option or choice of performing the essential requirements of her own occupation from 10/19/05 to the present due to any psychiatric disorder." (AR 79.) Dr. Slack noted that "[t]here is no evidence to support a psychiatric disability . . . " and that "[c]linical findings suggest the presence of significant work conflict with subsequent psychiatric symptomatology. This is important but it represents a human resource difficulty and/or a legal issue, not a psychiatric disability." (AR 79.) Dr. Slack concluded that the "objective information does not support an inability to perform job duties" and stated:

> It should be noted that there is no psychiatric hospitalization, psychosis, delirium/ dementia, or suicidal/homicidal behavior. There is no evidence of a chronic mental illness with long-term treatment. There is no evidence of any acuity or a high level of current psychiatric care. This does not support a disability.

(AR 79.)

---

[8]Dr. Slack's summary states that Sandt-Mika was seen by a licensed professional counselor, Deanna Rodgers, on November 7, 2005 and February 6, 2006, and that Ms. Rogers sent a letter of support dated February 7, 2006. (AR 78.) It appears that Dr. Slack meant Ms. Wleklinski because Sandt-Mika's February 6, 2006 office visit was with Ms. Wleklinski, who then sent the February 7 letter. (AR 87.) Deanna Rodgers apparently is in Dr. Pantano's office. (AR 125.)

The SMAART Quality Review Unit received Dr. Slack's report, decided to uphold the denial of Sandt-Mika's disability claim, and notified Sandt-Mika of its decision by telephone and letter dated February 20, 2006. (AR 28-31, 71-72.) The letter referred to the medical information received from Dr. Pantano, Dr. Velasco and Ms. Wleklinski, and stated that Sandt-Mika "received treatment for the diagnosis of acute stress reaction." (AR 71.) The letter also discussed Dr. Slack's conclusions:

> The independent physician advisor, a psychiatrist, indicated that it should be noted that there was no evidence of psychiatric hospitalization or the symptoms of psychosis, delirium/dementia or suicidal/homicidal behavior. He commented that there was no evidence of a chronic mental illness requiring long-term treatment. He indicated there was no evidence of a high level of acuity related to a psychiatric condition. He stated that this medical information does not support disability.

(AR 71-72.) The Quality Review Unit further stated that "[a]lthough some findings are referenced, none are documented to be as severe as to prevent you from performing the duties of your job as a Manager of Quality M&P Process, with or without reasonable accommodation from October 19, 2005 through the day prior to return to work." (AR 72.) On April 13, 2007, Sandt-Mika initiated this lawsuit against the Plan to recover short-term disability benefits. (Compl. ¶ 1.) [Dkt 1.]


## STANDARD OF REVIEW

A denial of ERISA benefits is reviewed under a *de novo* standard unless the benefit plan gives the administrator discretionary authority to determine benefit eligibility or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If a plan gives the power of discretionary determination to the administrator, the court will upset its determination only if it was arbitrary and capricious. *Herzberger v. Standard Ins. Co.,* 205 F.3d 327, 329 (7th Cir.

2000). "[T]he critical question is whether the plan gives the employee adequate notice that the plan administrator is to make a judgment within the confines of pre-set standards, or if it has the latitude to shape the application, interpretation, and content of the rules in each case." *Diaz v. Prudential Ins. Co. of Am.,* 424 F.3d 635, 639-40 (7th Cir. 2005).

The parties here do not dispute that the Plan Text contains language sufficient to confer discretionary authority on Sedgwick and SMAART as claims administrator. (Pl.'s Mem. at 9; Def.'s Mem. at 11.)[9] Accordingly, the arbitrary and capricious standard of review is appropriate here.

Under that deferential standard of review, a decision to deny benefits will be upheld "so long as that decision has 'rational support in the record.'" *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006) (citation omitted). "[Q]uestions of judgment are left to the plan administrator, and it is not our function to decide whether we would reach the same conclusion as the administrator." *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan,* 429 F.3d 698, 701 (7th Cir. 2005) (internal quotations and citations omitted); *see also Kobs v. United Wisc. Ins. Co.*, 400 F.3d 1036, 1039 (7th Cir. 2005) ("Under the arbitrary and capricious standard, we do not

---

[9]The Plan Text states in relevant part:

5.5.4  Claim Decision-Making Authority

The Committee and each Claims Administrator and each subcommittee to whom claim determination or review authority has been delegated shall have full and exclusive authority and discretion to grant and deny claims under the Plan, including the power to interpret the Plan and determine the eligibility of any individual to participate in and receive benefits under the Plan. The decision of the Committee or a Claims Administrator or any subcommittee, as applicable, on any claim, in accordance with the claim procedures set forth in this Subsection 5.5, shall be final and conclusive and shall not be subject to further review.

(Plan Text, AR 21.)

ask whether the administrator reached the correct conclusion or even whether it relied on the proper authority.") (citation omitted). "Put simply, an administrator's decision will not be overturned unless it is 'downright unreasonable.'" *Davis*, 444 F.3d at 576 (citation omitted).

Thus, on the parties' respective motions for judgment on the record, the issue is whether there is rational support in the record for SMAART's determination that Sandt-Mika was not disabled "because of Illness or Injury" so that she was "unable to perform all of the essential functions of [her] job or another available job assigned by [SBC], within the same full- or part-time classification for which [she] is qualified . . . ." (Plan Text, AR 10.)

## ANALYSIS

Sandt-Mika argues that the decision to deny her benefits failed to consider Dr. Velasco's report and diagnosis and instead relied solely on the diagnosis of "acute stress reaction" made by Dr. Pantano. (Compl. ¶ 9.) The record shows that SMAART received and considered Dr. Velasco's information, which included the diagnosis of "major depresssive disorder, single episode." (AR 115.) SMAART's November 18, 2005 letter denying benefits refers to information received from both Dr. Pantano and Dr. Velasco. (AR 109.) The information was found to be "lacking clinical indicators to support a totally disabling condition." (AR 109-10.) Similarly, the February 20, 2006 letter denying Sandt-Mika's appeal refers to information received from Dr. Pantano, Dr. Velasco, and Ms. Wleklinski from October 11, 2005 through February 7, 2006. (AR 71.)

Notwithstanding those references to Dr. Velasco's information, Sandt-Mika argues that SMAART's February 20 letter does not expressly mention Dr. Velasco's diagnosis but does mention Dr. Pantano's diagnosis. She points to the portion of the letter stating, "The medical information

indicated that you received treatment for acute stress reaction." (Pl.'s Mem. at 9 (citing AR 71).) That statement is supported by the record. Sandt-Mika did not consult Dr. Velasco until November 11, 2005 – a month after she applied for benefits. Until November 11, Sandt-Mika was being treated by Dr. Pantano pursuant to that doctor's diagnosis. Until November 14, when Dr. Velasco submitted her office notes of the November 11 visit, Dr. Pantano's diagnosis of "acute stress reaction" was the *only* one Sandt-Mika submitted to SMAART to support her claim. As Sandt-Mika concedes, the Plan's MHTPS looks for a diagnosis derived from DSM-IV, and "acute stress reaction" is not a classification included in DSM-IV. (Pl.'s Resp. at 3.) [Dkt 40.] Sandt-Mika also admits that a participant applying for benefits based on that diagnosis is not disabled. (*Id*. at 3-4.) Thus, at the time Sandt-Mika submitted her claim, she was being treated for "acute stress reaction" and there was admittedly insufficient medical evidence to support a finding of disability. It was not until November 25 -- after SMAART had initially denied the claim -- that Dr. Velasco completed the MHTPS form.

The specific reference to Dr. Velasco's information in both the letter denying the claim and the letter denying the appeal rebuts Sandt-Mika's claim that SMAART ignored Dr. Velasco's diagnosis, although the denial letters do not expressly refer to that diagnosis. Dr. Slack's review of Sandt-Mika's claim, upon which the Plan relied in denying her appeal, fully considered Dr. Velasco's information, including the diagnosis of "major depressive disorder, single episode." He found that the information to support that diagnosis was absent. (AR 78.)

Sandt-Mika argues that the Plan cannot rely on Dr. Slack's review because Sandt-Mika was not provided a copy of Dr. Slack's letter along with the letter denying her appeal. (Pl.'s Resp. at 3.) The authorities Sandt-Mika cites, however, do not support her position. ERISA §1133(1) requires

that the Plan provide "adequate notice . . . setting forth the specific reasons for such denial." 29 C. F. R. § 2560. 503-1(j) is virtually identical, requiring the notification to state "[t]he specific reason or reasons for the adverse determination." Both of the denial letters satisfy that requirement. The letter denying her appeal refers to the review by an independent physician advisor, a psychiatrist, who found, *inter alia*, no evidence of chronic mental illness requiring long term treatment and no evidence of a high level of acuity related to a psychiatric condition. (AR 71-72.) *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), which Sandt-Mika also cites, does not support her argument. In that case, the Court held that ERISA does not require special deference to the opinions of treating doctors, nor does it impose a heightened burden of explanation on the administrators when they reject a treating physician's opinion. 538 U.S. at 831. SMAART's February 20 letter expressly stated its reliance on the opinion of the independent physician advisor (Dr. Slack), and it is not true, as Sandt-Mika claims, that the Plan is now "defend[ing] its denial of benefits based on reasons that the Plan did not rely on in the first place." (Pl.'s Resp. at 3.)

SMAART followed appropriate procedures. Its case managers explained SBC's disability policies and procedures to Sandt-Mika, including the requirement that a claimant supply necessary medical information supporting a complete inability to perform the assigned job duties. SMAART's oral and written communications stated clearly that if the medical documentation received from Sandt-Mika's treatment providers did not contain information establishing that her condition prevented her from performing the duties of her job with or without reasonable accommodations, her claim would not qualify for benefits under the Plan. When Sandt-Mika failed to submit the necessary documentation on a timely basis, SMAART agreed to delay its disposition of the claim based on the representation that Sandt-Mika or her physician would be submitting additional

information. During the appeal of the denial decision, the SMAART appeals specialist talked to Sandt-Mika about submitting additional information, contacted Sandt-Mika to remind her of the pending deadline, and then granted her an extension of time when she was unable to produce the medical information on time. The denial was reviewed by a person not involved in the original decision, and a psychiatrist, Dr. Slack, was consulted. SMAART stated its reasons for denying Sandt-Mika's claim, referred to the pertinent Plan provision on which the denial was based, and apprised Sandt-Mika of her right to appeal its decision and of her right to file suit in federal district court under ERISA. The Plan gave Sandt-Mika a fair opportunity to demonstrate her disability.

As stated above, the critical issue on the present motion is whether there is support in the record for the Plan's conclusion that Sandt-Mika failed to demonstrate that she was disabled under the Plan's definition of "disability," that is, unable because of illness or injury to perform all of the essential functions of her job or another available job assigned by SBC, within the same full- or part-time classification for which she is qualified.

It cannot be said that the Plan was "downright unreasonable" in finding that Sandt-Mika did not demonstrate her inability to perform her duties. Significantly, Dr. Velasco, on whose diagnosis Sandt-Mika relies, made *no response* to the specific question, "What job required activites is the employee unable to do?" The space was left blank on the form Dr. Velasco submitted. (AR 108.)

While both treating doctors noted Sandt-Mika's self-reported subjective complaints, their submissions to the Plan lack objective medical evidence establishing that Sandt-Mika met the Plan's definition of disability. In contrast to Sandt-Mika's self-reported inability to sleep and concentrate, her doctors both observed that Sandt-Mika was well-groomed, fully oriented, her motor activity was normal, and her thought processes were intact. *See Williams v. Aetna Life Ins. Co.*, 509 F.3d 317,

322 (7th Cir. 2007) ("A distinction exists . . . between the amount of fatigue or pain an individual experiences, which as *Hawkins* [*v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914 (7th Cir. 2003)] notes is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured.") (citations omitted); *Ruiz v. Continental Casualty Co.*, 400 F.3d 986, 992 (7th Cir. 2005) (concluding that it was not "downright unreasonable" for plan to deny benefits where "primary evidence supporting [plaintiff's] claim that he cannot perform any work for which he is trained was his own subjective complaints of pain").

Dr. Velasco assigned Sandt-Mika a GAF score of 50, which denotes "serious symptoms" or "any serious impairment in social, occupational, or school functioning," without explaining why the score was given. Notwithstanding that score, Sandt-Mika's treatment by her doctors was quite limited. Dr. Pantano referred Sandt-Mika for "behavioral health, four visits" and advised Sandt-Mika to rest and go for counseling. (AR 142-43.) Sandt-Mika met with Dr. Velasco on only three occasions in a three-month period, and with her therapist Ms. Wleklinski only once in a four-month period. Dr. Velasco's progress notes from the December 2, 2005 and February 3, 2006 appointments call for follow-up visits in two months and then in three months, respectively. (AR 89.) None of Sandt-Mika's professionals recommended hospitalization or in-patient treatment.

The Plan was not required to accept the treating doctors' opinions when unsupported by other evidence. "[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan,* 538 U.S. at 834.

In her multi-page appeal letter, which Sandt-Mika herself wrote, she attributes her condition

to "a hostile work environment" caused by the company and her supervisor, aggravated by the requirement of documenting her disability. (AR 96-97.) According to Dr. Slack, "Clinical findings suggest the presence of significant work conflict with subsequent psychiatric symptomatology. This is important but it represents a human resource difficulty and/or a legal issue, not a psychiatric disability." (AR 79.)

At all times, Sandt-Mika had the burden of establishing that she was disabled as defined by the Plan Text. The Plan's determination that she failed to provide evidence that she met that definition was not unreasonable.


## CONCLUSION

For the reasons stated herein, Sandt-Mika's Motion for Judgment on the Administrative Record is denied and the Plan's Motion is granted. Judgment is entered in favor of the defendant SBC Disability Income Plan and against the plaintiff Laura Sandt-Mika.


**IT IS SO ORDERED.**

_____
Geraldine Soat Brown
United States Magistrate Judge


September 18, 2008